**UNITED STATES of America,**
**Appellant,**

v.

**Eid HAMMAD, a/k/a Eddie Hammad,**
**and Taiseer Hammad,**
**Defendants–Appellees.**

**No. 882, Docket 87–1513.**

United States Court of Appeals,
Second Circuit.

Argued March 24, 1988.

Decided May 12, 1988.

Revised Sept. 23, 1988.

As Amended Nov. 29, 1988.

Sean F. O'Shea, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., John Gleeson, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellant U.S.

Richard A. Greenberg, New York City (Robert Hill Schwartz, New York City, of counsel), for defendant-appellee Taiseer Hammad.

Harvey L. Greenberg, New York City (Washor, Greenberg & Washor, New York City, of counsel), for defendant-appellee Eid Hammad.

Before KAUFMAN, CARDAMONE and PIERCE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

On November 30, 1985, the Hammad Department Store in Brooklyn, New York, caught fire under circumstances suggesting arson. The Bureau of Alcohol, Tobacco and Firearms was assigned to investigate in conjunction with the United States Attorney for the Eastern District of New York.

During the course of his investigation, an Assistant United States Attorney ("AUSA") discovered that the store's owners, Taiseer and Eid Hammad, had been audited by the New York State Department of Social Services for Medicaid fraud. The audit revealed that the Hammad brothers had bilked Medicaid out of $400,000; they claimed reimbursement for special orthopedic footwear but supplied customers with ordinary, non-therapeutic shoes. Consequently, the Department revoked the Hammads' eligibility for Medicaid reimbursement and demanded return of the $400,000 overpayment. The Hammads challenged the Department's determination and submitted invoices purporting to document their sales of orthopedic shoes. The invoices were received from Wallace Goldstein of the Crystal Shoe Company, a supplier to the Hammads' store.

On September 22, 1986, however, Goldstein informed the AUSA that he had provided the Hammads with false invoices. Government investigators, therefore, suspected the fire had been intended to destroy actual sales records, thereby concealing the fraudulent Medicaid claims. Goldstein agreed to cooperate with the government's investigation. Accordingly, the prosecutor directed Goldstein to arrange and record a meeting with the Hammads.

Some three weeks later, on October 9, Goldstein telephoned the Hammads. He spoke briefly with Eid, who referred him to

Taiseer. Goldstein falsely told Taiseer he had been subpoenaed to appear before the grand jury investigating the Hammads' Medicaid fraud. He added that the grand jury had requested records of Crystal's sales to the Hammad Department Store to compare them with the invoices the Hammads had submitted. Taiseer did not deny defrauding Medicaid, but instead urged Goldstein to conceal the fraud by lying to the grand jury and by refusing to produce Crystal's true sales records. He also questioned Goldstein regarding the contents of his subpoena, which did not actually exist. Goldstein responded that he did not have the subpoena in his possession. He agreed to inquire further. One hour later, presumably after speaking with the AUSA, Goldstein telephoned Taiseer again and described the fictitious subpoena.

Goldstein and Hammad saw each other five days later. The meeting was recorded and videotaped. Goldstein showed Hammad a sham subpoena supplied by the prosecutor. The subpoena instructed Goldstein to appear before the grand jury and to provide any records reflecting shoe sales from Crystal to the Hammad Department Store. Hammad apparently accepted the subpoena as genuine because he spent much of the remainder of the meeting devising strategies for Goldstein to avoid compliance. The two held no further meetings.

On April 15, 1987, after considering the recordings, videotapes and other evidence, the grand jury returned a forty-five count indictment against the Hammad brothers, including thirty-eight counts of mail fraud for filing false Medicaid invoices. Eid was also indicted for arson and for fraudulently attempting to collect fire insurance. Taiseer faced the additional charge of obstructing justice for attempting to influence Goldstein's grand jury testimony. The case was assigned to Judge Glasser of the Eastern District of New York.

Before trial, Taiseer Hammad moved to suppress the recordings and videotapes, alleging the prosecutor had violated DR

7-104(A)(1) of the American Bar Association's Code of Professional Responsibility. The rule prohibits a lawyer from communicating with a "party" he knows to be represented by counsel regarding the subject matter of that representation. In short, Taiseer alleged that the prosecutor— through his "alter ego" Goldstein—had violated ethical obligations by communicating directly with him after learning that he had retained counsel.

A hearing was convened on September 17, 1987, to consider the suppression motion and, specifically, to ascertain whether the prosecutor knew, at the time, that Taiseer had counsel. In support of his motion, Hammad submitted affidavits from his attorney, Richard Greenberg, and his prior counsel, George Weinbaum. Weinbaum also testified at the hearing.

In essence, Weinbaum testified that, from August 1985 to June 1987, he represented Taiseer Hammad in all aspects of his Medicaid dispute. Specifically, Weinbaum recounted telephoning the AUSA in July 1986 and informing him that he "represented Taiseer Hammad and the Hammad department store." He did not comply with a request for written confirmation of his relationship with Taiseer, but did not suggest any change in his status as Hammad's attorney.

The government vigorously disputed Hammad's assertion that the prosecutor had violated ethical standards by authorizing Goldstein to approach the defendant. It argued that DR 7-104(A)(1) was irrelevant to criminal investigations. Alternatively, it claimed the rule did not apply to investigations prior to the commencement of adversarial proceedings against a defendant. In addition, the government denied that, at the time he directed Goldstein to approach Taiseer, the prosecutor knew Taiseer was represented by counsel. The government argued that the AUSA reasonably believed Weinbaum ceased representing Taiseer on September 15, 1986. Thus, the argument proceeds, Taiseer had no attorney when he met with Goldstein. The

government, however, failed to present any evidence to support its factual contentions or to rebut Weinbaum's assertion that he continued to represent Taiseer. It rested on its legal contention that DR 7–104(A)(1) did not apply.

In an order dated September 21, 1987, Judge Glasser granted Taiseer's motion to suppress the recordings and videotapes. 678 F.Supp. 397 (E.D.N.Y.1987). The government, he found, "was clearly aware, by at least as early as September 9, 1986, that [Taiseer] had retained counsel in connection with this case." 678 F.Supp. at 399. He also determined that Goldstein was the prosecutor's "alter ego" during his discussions with Hammad. Accordingly, the court held that the prosecutor had violated DR 7–104(A)(1) and suppressed the recordings and videotapes secured as a result of the violation.

The government moved for reconsideration on September 28, 1987, and belatedly proffered the AUSA's affidavit responding to Taiseer's factual assertions. The district court denied reconsideration without considering the affidavit. This appeal ensued, pursuant to 18 U.S.C. § 3731.

The government challenges Judge Glasser's application of this ethical precept in suppressing the recordings and videotapes of Taiseer Hammad's conversations with Wallace Goldstein. The government repeats the arguments it presented at the suppression hearing. Specifically, it argues that the Assistant United States Attorney could not have violated DR 7–104(A)(1) because the provision is inapplicable to criminal investigations under any circumstances, or, alternatively, that DR 7–104(A)(1) becomes operative only after sixth amendment rights have attached. The government also contests the district court's finding that the prosecutor knew Weinbaum represented Hammad when he dispatched Goldstein and that Goldstein was his "alter ego." Finally, the government urges that suppression is not available to remedy an ethical violation.

We decline to hold, as the government suggests, either that DR 7–104(A)(1) is limited in application to civil disputes or that it is coextensive with the sixth amendment. Nor has the government provided an adequate basis for reversing the able district judge's determination, after the suppression hearing, that the prosecutor knew Hammad had legal representation or that Goldstein was his "alter ego." We are mindful, however, that suppression of evidence is an extreme remedy that may impede legitimate investigatory activities. Accordingly, we find, in this case, that suppression of the recordings and videotapes constituted an abuse of the district court's discretion.

Rule DR 7–104(A)(1) of the American Bar Association's Model Code of Professional Responsibility governs relations between attorneys and adverse parties they know are represented by counsel. It provides:

A. During the course of his representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Model Code of Professional Responsibility DR 7–104(A)(1). Accordingly, lawyers are constrained to communicate indirectly with adverse parties through opposing counsel.

This restriction is not statutorily mandated. The federal courts enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar. *In Re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985). In addition, the Eastern District of New York, where this action arose, has adopted the Code of Professional Responsibility through Local Rule 2 of its General Rules.

This circuit conclusively established the applicability of DR 7–104(A)(1) to criminal prosecutions in *United States v. Jamil*,

707 F.2d 638 (2d Cir.1983). In *Jamil*, we held that "DR 7–104(A)(1) may be found to apply in criminal cases, ... to government attorneys ... [and] to non-attorney government law enforcement officers when they act as the alter ego of government prosecutors." 707 F.2d at 645 (citations omitted). Even those courts restricting the rule's ambit have suggested that, in appropriate circumstances, DR 7–104(A)(1) would apply to criminal prosecutions. *See, e.g., United States v. Kenny*, 645 F.2d 1323, 1339 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lemonakis*, 485 F.2d 941, 954–56 (D.C. Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1984); *United States v. Massiah*, 307 F.2d 62, 65–66 (2d Cir.1962), *rev'd on other grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Thus, the government's contention that DR 7–104(A)(1) is "inapplicable to criminal investigations" is mistaken.

■ The applicability of DR 7–104(A)(1) to the investigatory stages of a criminal prosecution presents a closer question. The government asserts the rule is coextensive with the sixth amendment, and hence, that it remains inoperative until the onset of adversarial proceedings. The appellee responds that several courts have enforced DR 7–104(A)(1) prior to attachment of sixth amendment protections. We find no principled basis in the rule to constrain its reach as the government proposes; indeed, even a recent district court decision *declining* to apply DR 7–104(A)(1) to the investigatory stages of a prosecution conceded, "Those courts that have found DR 7–104(A)(1) inapplicable to the investigatory stage of a criminal prosecution have not clearly stated the bases for those decisions." *United States v. Guerrerio*, 675 F.Supp. 1430, 1436 (S.D.N.Y.1987). Nonetheless, we urge restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence.

The government relies substantially on dicta from *United States v. Vasquez*, 675 F.2d 16, 17 (2d Cir.1982) (*per curiam*), where we suggested that DR 7–104(A)(1)'s applicability to a criminal investigation "is doubtful." More recently, however, in *Jamil*, we observed that the question remained open "whether DR 7–104(A)(1) would have been violated in this context...." 707 F.2d at 646. And we have intimated that similar practices, such as prearraignment interviews outside the presence of defense counsel, may contravene DR 7–104(A)(1) although they pass constitutional muster. *United States v. Foley*, 735 F.2d 45, 48 (2d Cir.1984), *cert. denied*, 469 U.S. 1161, 105 S.Ct. 915, 83 L.Ed.2d 928 (1985).

In addition, contrary to the government's assertions, at least two district courts in this circuit have concluded that the rule applies irrespective of the sixth amendment. In *United States v. Sam Goody, Inc.*, 506 F.Supp. 380, 393–94 (E.D.N.Y. 1981), the court initially rejected defendant's sixth amendment claims but, in subsequent proceedings, *United States v. Sam Goody, Inc.*, 518 F.Supp. 1223, 1224–25 n. 3 (E.D.N.Y.1981), *appeal dismissed*, 675 F.2d 17 (2d Cir.1982), found it "unethical for the government to 'wire' an informant and send him to one of the defendants' offices in an attempt to elicit incriminating statements *after* that defendant's attorney had presented himself to the prosecutor and told him to deal with his client only through him (the attorney)." (emphasis in original). Thus, the trial judge expressly extended the rule beyond the confines of the sixth amendment.

Thereafter, in the lower court's *Jamil* decision, Judge Weinstein of the Eastern District of New York exhaustively considered the government's contention that DR 7–104(A)(1) is coextensive with the sixth amendment. He noted that several courts have hinted at this "unity" and treated the Disciplinary Rule as little more than an appendage to the constitutional provision, without independent import in this context. *United States v. Jamil*, 546 F.Supp. 646, 655–58 (E.D.N.Y.1982), *rev'd*

*on other grounds,* 707 F.2d 638 (2d Cir. 1983). *See, e.g., Kenny,* 645 F.2d at 1339; *Lemonakis,* 485 F.2d at 954–56. Such treatment, however, makes the rule superfluous, and "is neither apparent nor compelling." 546 F.Supp. at 657. The sixth amendment and the disciplinary rule serve separate, albeit congruent purposes.

The Constitution defines only the "minimal historic safeguards" which defendants must receive rather than the outer bounds of those we may afford them. *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943). In other words, the Constitution prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise. The Model Code of Professional Responsibility, on the other hand, encompasses the attorney's duty "to maintain the highest standards of ethical conduct." Preamble, Model Code of Professional Responsibility (1981). The Code is designed to safeguard the integrity of the profession and preserve public confidence in our system of justice. It not only delineates an attorney's duties to the court, but defines his relationship with his client and adverse parties. Hence, the Code secures protections not contemplated by the Constitution.

Moreover, we resist binding the Code's applicability to the moment of indictment. The timing of an indictment's return lies substantially within the control of the prosecutor. Therefore, were we to construe the rule as dependent upon indictment, a government attorney could manipulate grand jury proceedings to avoid its encumbrances.

The government contends that a broad reading of DR 7–104(A)(1) would impede legitimate investigatory practices. In particular, the government fears career criminals with permanent "house counsel" could immunize themselves from infiltration by informants. *See United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *Vasquez,* 675 F.2d at 17; *Guerrerio,* 675 F.Supp. at 1436. We share

this concern and would not interpret the disciplinary rule as precluding undercover investigations. Our task, accordingly, is imposing adequate safeguards without crippling law enforcement.

The principal question presented to us herein is: to what extent does DR 7–104(A)(1) restrict the use of informants by government prosecutors prior to indictment, but after a suspect has retained counsel in connection with the subject matter of a criminal investigation? In an attempt to avoid hampering legitimate criminal investigations by government prosecutors, Judge Glasser resolved this dilemma by limiting the rule's applicability "to instances in which a suspect has retained counsel specifically for representation in conjunction with the criminal matter in which he is held suspect, and the government has knowledge of that fact." *Hammad,* 678 F.Supp. at 401. Thus, he reasoned, the rule exempts the vast majority of cases where suspects are unaware they are being investigated.

■ While it may be true that this limitation will not unduly hamper the government's ability to conduct effective criminal investigations in a majority of instances, we nevertheless believe that it *is* unduly restrictive in that small but persistent number of cases where a career criminal has retained "house counsel" to represent him in connection with an ongoing fraud or criminal enterprise. This Court has recognized that prosecutors have a responsibility to perform investigative as well as courtroom-related duties in criminal matters, *see, e.g., Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). As we see it, under DR 7–104(A)(1), a prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization.

■ Notwithstanding this holding, however, we recognize that in some instances a

government prosecutor may overstep the already broad powers of his office, and in so doing, violate the ethical precepts of DR 7–104(A)(1). In the present case, the prosecutor issued a subpoena for the informant, not to secure his attendance before the grand jury, but to create a pretense that might help the informant elicit admissions from a represented suspect. Though we have no occasion to consider the use of this technique in relation to unrepresented suspects, *see United States v. Martino*, 825 F.2d 754 (3d Cir.1987), we believe that use of the technique under the circumstances of this case contributed to the informant's becoming the alter ego of the prosecutor. Consequently, the informant was engaging in communications proscribed by DR 7–104 (A)(1).[1] *See Massiah*, 307 F.2d 62, 66 (2d Cir.1962), *rev'd on other grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Therefore, we agree with Judge Glasser that the prosecution violated the disciplinary rule in this case.

■ Notwithstanding requests for a bright-line rule, we decline to list all possible situations that may violate DR 7–104(A)(1). This delineation is best accomplished by case-by-case adjudication, particularly when ethical standards are involved. As our holding above makes clear, however, the use of informants by government prosecutors in a preindictment, non-custodial situation, absent the type of misconduct that occurred in this case, will generally fall within the "authorized by law" exception to DR 7–104(A)(1) and therefore will not be subject to sanctions.

■ On appeal, the government also claims that even if there was a violation of the disciplinary rule, exclusion is inappropriate to remedy an ethical breach. We have not heretofore decided whether suppression is warranted for a DR 7–104(A)(1) violation. *See, e.g., Jamil*, 707 F.2d at 646. We now hold that, in light of the underlying purposes of the Professional Responsibility Code and the exclusionary rule, suppression may be ordered in the district court's discretion.

The exclusionary rule mandates suppression of evidence garnered in contravention of a defendant's constitutional rights and protections. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The rule is thus intended to: deter improper conduct by law enforcement officials, *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); preserve judicial integrity by insulating the courts from tainted evidence, *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *Elkins*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669; *Olmstead v. United States*, 277 U.S. 438, 469, 48 S.Ct. 564, 569, 72 L.Ed. 944 (1928) (Holmes, J., dissenting); and maintain popular trust in the integrity of the judicial process, *United States v. Calandra*, 414 U.S. 338, 357, 94 S.Ct. 613, 624, 38 L.Ed.2d 561 (1974) (Brennan, J., dissenting). Anything short of exclusion, the Supreme Court reasoned, would be "worthless and futile" in securing the rule's goals. *Mapp*, 367 U.S. at 652, 81 S.Ct. at 1690.

These same needs arise outside the context of constitutional violations. "The principles governing the admissibility of evidence in federal criminal trials have not been restricted ... to those derived solely from the Constitution." *McNabb v. United States*, 318 U.S. at 341, 63 S.Ct. at 613. Hence, the exclusionary rule has application to governmental misconduct which

---

1. *See also* ABA Standards Relating to the Administration of Criminal Justice, Standard 3–3.1(d) ("It is unprofessional conduct for a prosecutor to secure the attendance of persons for interviews by use of any communication which has the appearance or color of a subpoena or similar judicial process unless the prosecutor is authorized by law to do so.").

falls short of a constitutional transgression.

Some statutes require exclusion by their own terms. For example, the government is precluded from introducing into evidence any wire or oral communication intercepted contrary to authorized procedures. 18 U.S.C. § 2515. Other statutes have been interpreted to permit exclusion when contravention of the statute interferes with a substantial right, such as prompt execution of a warrant. *See Commonwealth v. Cromer*, 365 Mass. 519, 313 N.E.2d 557 (1974); W. LaFave and J. Israel, Criminal Procedure, § 3.1, p. 146. Indeed, suppression may even be ordered for violations of administrative regulations. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). In the instant case, we consider the exclusionary rule's applicability to yet another category of non-constitutional transgressions—breaches of ethical precepts enforced pursuant to the federal courts' supervisory authority.

For half a century, the Supreme Court has recognized that "civilized conduct of criminal trials" demands federal courts be imbued with sufficient discretion to ensure fair proceedings. *Nardone v. United States*, 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed.2d 307 (1939). Thus, as Justice Frankfurter observed, "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb*, 318 U.S. at 340, 63 S.Ct. at 612. Such standards constitute an exercise of the courts' supervisory authority. *McNabb*, 318 U.S. at 341, 63 S.Ct. at 613.

Specifically, the Supreme Court has expressly authorized federal courts to exercise their "supervisory power in some circumstances to exclude evidence taken from the *defendant* by 'willful disobedience of law,'" *Payner*, 447 U.S. at 735 n. 7, 100 S.Ct. at 2446 n. 7, quoting *McNabb*, 318 U.S. at 345, 63 S.Ct. at 615 (emphasis in original), or "when the defendant asserts a violation of his own rights," *Payner*, 447 U.S. at 734–35, 100 S.Ct. at 2445–46. Other circuits have expressly included suppression among the panoply of remedies available to district judges for violations of DR 7–104(A)(1). *United States v. Killian*, 639 F.2d 206 (5th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *United States v. Durham*, 475 F.2d 208 (7th Cir.1973); *United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973).

In *Thomas*, the Tenth Circuit excluded a defendant's written statement obtained by a state law enforcement agent without the knowledge or consent of defense counsel. Specifically, the court held that "once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant *may not be offered in evidence for any purpose* unless the accused's attorney was notified of the interview...." *Thomas*, 474 F.2d at 112 (emphasis added). Thus, the Tenth Circuit not only permitted, but actually required suppression of evidence violative of the ethical canon.

Shortly thereafter, in *Durham*, the Seventh Circuit reached a similar conclusion, citing "ethical questions" concerning statements taken "in the absence of retained counsel known to be representing the defendant on this criminal charge." 475 F.2d at 211. And more recently, in *Killian*, the Fifth Circuit opined that "[s]uppression of the statements would probably have been the appropriate sanction in this case, were it not for the refusal of the government to use those statements." 639 F.2d at 210.

Moreover, at least one district court in this circuit has relied upon this line of analysis, expressing willingness to exclude evidence garnered in contravention of the Rule. *United States v. Howard*, 426 F.Supp. 1067 (W.D.N.Y.1977). Thus, after finding a constitutional basis to suppress the defendant's statements, the court alternatively refused to "allow this contested evidence to be admitted at trial ... because the government failed to advise defendant's counsel of the continued interrogation

and refused to heed counsel's directive that interrogation should not proceed in his absence." *Howard,* 426 F.Supp. at 1072.

The government argues that other circuits have refused to suppress evidence for disciplinary rule violations. *See, e.g., United States v. Sutton,* 801 F.2d 1346 (D.C. Cir.1986); *United States v. Dobbs,* 711 F.2d 84 (8th Cir.1983); *Lemonakis,* 485 F.2d 941 (D.C.Cir.1973). These cases, however, are inapposite because the courts never resolved the exclusion issue. Rather, they held DR 7–104(A)(1) was not violated, and, thus, the remedy question never arose.

Accordingly, we reject the government's effort to remove suppression from the arsenal of remedies available to district judges confronted with ethical violations. We have confidence that district courts will exercise their discretion cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth. *See Elkins,* 364 U.S. at 216, 80 S.Ct. at 1443–44.

█ Judge Glasser apparently assumed, as the *Thomas* court implied, that suppression is a necessary consequence of a DR 7–104(A)(1) violation. Exclusion, however, is not required in every case. Here, the government should not have its case prejudiced by suppression of its evidence when the law was previously unsettled in this area. Therefore, in light of the prior uncertainty regarding the reach of DR 7–104(A)(1), an exclusionary remedy is inappropriate in this case.

Accordingly, we find the district court abused its discretion in suppressing the recordings and videotapes, and its decision is reversed.