911 F.2d 726
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Thomas WORTHINGTON, Jr. (Tommy), Defendant-Appellant.
 No. 89-5417.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1990.
Decided July 31, 1990.
As Amended Oct. 12, 1990.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (CR-88-49-5)
 James Richard Van Camp, Van Camp, West, Webb & Hayes, P.A., Pinehurst, N.C., (argued), for appellant; W. Carole Holloway, Van Camp, West, Webb & Hayes, P.A., Pinehurst, N.C., on brief.
 Richard A. Friedman, United States Department of Justice, Washington, D.C., for appellee; Margaret P. Currin, United States Attorney, John Bruce, Assistant United States Attorney, Raleigh, N.C., on brief.
 E.D.N.C.
 AFFIRMED.
 Before SPROUSE, WILKINSON and WILKINS, Circuit Judges.
 Affirmed by unpublished per curiam opinion. Judge Sprouse wrote a dissenting opinion.
 PER CURIAM:
 
 
 1
 John Thomas (Tommy) Worthington, Jr. was convicted of arson, conspiracy to commit arson, check kiting, and mail, wire and bank fraud. The trial judge sentenced Worthington to fourteen years and three months imprisonment. On appeal, Worthington alleges that the district court committed numerous errors, including the wrongful admission of testimony gathered through consensual tape recordings and wire intercepts. Finding no merit in any of these contentions, we affirm the judgment of the district court.
 
 I.
 
 2
 This case grew out of a federal investigation into a series of arsons in Eastern North Carolina. The government made its first inroad in the matter when it apprehended Ronnie Lee Stocks in the act of setting fire to a chicken house owned by the federal government. Stocks admitted participation in seven fires, and became a government informant. He soon implicated Harvey Bowen--a friend and business associate of appellant Worthington--as an accomplice in some of the arsons. The government began surveillance of Bowen to investigate his involvement in these and other crimes. In addition, it outfitted Stocks with a concealed tape recorder in numerous conversations with Bowen and received court approval to place a monitoring device in Bowen's office and to place a tap on Bowen's business telephones.
 
 
 3
 Stocks' testimony and recordings of a number of conversations involving Stocks, Bowen, and Worthington revealed Worthington's involvement in several illegal activities. Worthington managed the Liberty Warehouse, a tobacco warehouse in Wilson, North Carolina, that was partially owned by his father. Beginning in 1980, Worthington furtively began drawing interest free loans from Liberty which he called "advances." These advances totaled $1.7 million, of which $611,000 remained outstanding in 1986. Worthington used these funds to finance his personal lifestyle and a myriad of unprofitable business ventures.
 
 
 4
 In addition to the interest free loans from Liberty, Worthington borrowed money from several banks. His loan applications, however, failed to reflect the sums he owed to Liberty. Worthington was also involved in a check kiting scheme in which he and Bowen would write checks backed by insufficient funds to establish false balances in numerous accounts against which further checks would be written. By this method, Worthington achieved short-term, interest-free extensions of bank credit and avoided bad check charges.
 
 
 5
 When these various schemes proved inadequate to satisfy Worthington's need for funds, Worthington and Bowen conspired to burn the Liberty warehouse. The government theorized that the Liberty arson was designed to serve the dual purpose of generating insurance proceeds and of destroying records of Worthington's advances from Liberty. Bowen hired Stocks to burn the Liberty warehouse, and it was with Bowen that Stocks primarily communicated. Stocks testified, though, that Worthington had knowledge of and was a participant in the Liberty arson. For example, Stocks met with Worthington at the Liberty warehouse on the evening of October 2, 1986, to finalize plans for the arson. At that time, Worthington told Stocks which door to the warehouse would be left open, and provided him with equipment needed to start the fire. An accomplice of Stocks corroborated Worthington's involvement, as did recorded conversations in which Stocks raised the issue of Worthington's participation in the arson without a protest of innocence from either Worthington or Bowen.
 
 
 6
 Stocks and an accomplice started the fire in the early morning of October 3, 1986. The fire destroyed the warehouse structure and its inventory. The financial records, however, were preserved because they were stored in a fireproof safe. Soon after the fire, Worthington processed insurance claims for the loss of the building, the business, and the inventory.
 
 
 7
 Bowen died of natural causes on March 1, 1988. On February 14, 1989, a grand jury returned an indictment against Worthington and his father. For his participation in the Liberty fire, Worthington was charged with arson and conspiracy to commit arson, 18 U.S.C. Secs. 841(i), 2, & 371; for his role in collecting the insurance proceeds from the arson, he was charged with fifteen counts each of mail and wire fraud, 18 U.S.C. Secs. 1341, 1343, & 2; and for his false loan applications and check floating schemes, he was charged with eight counts of bank fraud, 18 U.S.C. Secs. 1014 & 2, and twenty counts of check kiting, 18 U.S.C. Secs. 1344 & 2. A jury found Worthington guilty of all charges with the exception of three of the bank fraud counts.
 
 II.
 
 8
 On appeal, Worthington charges that the trial court erred numerous times in admitting recorded conversations obtained through wire intercepts and concealed recorders. Each of his contentions lacks merit.
 
 A.
 
 9
 Worthington first contends that the incriminating evidence gathered through wire intercepts on Bowen's telephone should have been suppressed because the affidavits executed in support of the wire intercept applications did not satisfy the requirements of Sec. 2518(1)(c). Section Sec. 2518(1)(c) states that an application for a wiretap must contain
 
 
 10
 a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.
 
 
 11
 Worthington maintains that electronic surveillance was unjustified under Sec. 2518(1)(c) because alternate investigative procedures were available to the authorities and had already proven successful.
 
 
 12
 Section 2518(1)(c) was "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974). While an application under Sec. 2518(1)(c) "must provide the court with sufficient detail to allow the court to determine the necessity of a wiretap, ... [t]he showing made under Sec. 2518(1)(c) ... must be tested in a practical and commonsense fashion." United States v. Leavis, 853 F.2d 215, 221 (4th Cir.1988) (citations and internal quotations omitted).
 
 
 13
 We conclude that the government complied with the requirements of Sec. 2518(1)(c). At the suppression hearing, federal agent David Lazar testified concerning the affidavits he executed in support of the applications. Agent Lazar explained why "it would be very difficult to [investigate] Harvey Bowen with conventional undercover electronic surveillance equipment." Bowen was familiar with law enforcement techniques, had well-placed sources in state and local government, and purportedly possessed electronic surveillance detection devices. Informants were relatively ineffective with Bowen because he isolated his co-conspirators from one another and was circumspect in his statements to them. Lazar further explained that Ronnie Stocks' relative lack of success in engaging Bowen in incriminating conversations demonstrated that "[t]here was no way" that the range of Bowen's illegal activities could be discovered through consensually monitored conversations.
 
 
 14
 This information demonstrates that the government attempted alternative law enforcement techniques which failed or were reasonably unlikely to succeed. It is true that informants and consensual recordings were partially successful in disclosing Bowen's and Worthington's illegal activities. But the government need not completely exhaust alternative investigative techniques before obtaining a wiretap order. United States v. Cole, 807 F.2d 262, 267 (1st Cir.1986). Instead, it need only show that continued exclusive use of these alternatives is unlikely to achieve fully the objectives of the investigation. Thus, the government's partial success using consensual recordings and informants does nothing to detract from its satisfactory showing under Sec. 2518(1)(c).
 
 B.
 
 15
 Worthington next argues that the district court erred in introducing a consensual tape recording of a conversation between himself and Stocks on February 17, 1988. The conversation took place in the midst of the grand jury investigation, and the prosecutor who instigated the conversation knew that Worthington was represented by counsel at the time. Worthington does not claim that use of this evidence violates any of his constitutional rights. Rather, he alleges that the recorded conversation should have been suppressed because it violated North Carolina Rule of Professional Conduct 7.4(A), which provides:
 
 
 16
 During the course of his representation of a client a lawyer shall not: (1) Communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
 
 
 17
 Worthington maintains that North Carolina has interpreted Rule 7.4(A) to apply to prosecutors, and that the appropriate remedy for violation of the Rule is suppression. The district court rejected this argument, holding that the prosecutor acted within the "authorized by law" exception to the North Carolina Rule and refused to suppress the consensual recording.
 
 
 18
 In pressing his claim, Worthington relies exclusively on United States v. Hammad, 858 F.2d 834 (2d Cir.1988). Hammad involved Disciplinary Rule 7-104(A)(1) of the American Bar Association's Code of Professional Responsibility, which is identical to the North Carolina Rule in issue here. In Hammad, an Assistant United States Attorney used an informant to record and videotape a defendant that he knew was represented by counsel regarding the subject matter of his investigation. To induce the defendant into talking, the AUSA instructed the informant to represent falsely that he was under a subpoena order. The Hammad court refused to suppress the recorded conversations. It held that the prosecutor's use of an informant in a preindictment setting, even when done with the knowledge that the defendant was represented by counsel, comes within the "authorized by law" exception to the Rule unless the prosecutor otherwise acts beyond the scope of his authority. 858 F.2d at 839-40. The court went on to rule that because the prosecutor had acted ultra vires by abusing the subpoena process, his acts did not fall within the "authorized by law" exception. Id. at 840. Even though the prosecutor in Hammad violated the ethical precept, however, the court refused to suppress the evidence because the particular point of law was previously unsettled. Id. at 840-42.
 
 
 19
 We are in some doubt about the correctness of Hammad 's broad statements concerning the applicability of rules of ethical conduct to federal criminal investigations. Moreover, this case, unlike Hammad, involves a state rule of conduct. Nonetheless, assuming, without deciding, that Hammad is correct, the decision is of no help to Worthington. Unlike in Hammad, there is no allegation here that the prosecutor in any way misused his investigative authority, and indeed the Hammad court noted that "the use of informants by government prosecutors in a preindictment, non-custodial situation ... will generally fall within the 'authorized by law' exception to DR 7-104(A)(1) and therefore will not be subject to sanctions." 858 F.2d at 840. Thus, even under Hammad the district court correctly held that the government's conduct was within the North Carolina Rule's "authorized by law" exception.
 
 C.
 
 20
 At trial, the government played for the jury numerous tape recordings of conversations between Worthington and Bowen. These recordings were sprinkled throughout with expletives, racial epithets, and other offensive language. Worthington objected to the introduction of the unexpurgated tapes on the ground that their prejudicial effect substantially outweighed their probative value, see Fed.R.Evid. 403, and motioned the court to require that the offensive language be redacted. The district court denied appellant's motion after issuing the following cautionary instruction to the jury:
 
 
 21
 I am going to let you hear the tape and the transcript as it was, but obviously there are words that are offensive because they are vulgar or profane or indecent. And the purpose of the objection [by defense counsel] is that you not be prejudiced or biased in the case because of language somebody might use when they don't know they are being taped. And I know you can't put a line down your mind, but you really need to be conscientious about not being influenced by the form of the word. I mean, you listen to the tape based on its content, on the substance of what is being said. Don't be biased or prejudiced personally because of the particular words that are used or that are words that you wouldn't want to hear. You have to hear them as a jury, but that is not the way you make your mind up in the case.
 
 
 22
 On appeal, Worthington argues that the district court's ruling was an abuse of discretion under Fed.R.Evid. 403.
 
 
 23
 A trial judge in this situation must weigh the potential prejudice to the defendant that attends the jury's consideration of unexpurgated recordings against the loss of context and concreteness, and ultimately the loss of probativeness, entailed by redaction. Its Rule 403 ruling cannot be reversed on appeal unless it constitutes "an arbitrary or irrational exercise of discretion." Garraghty v. Jordan, 830 F.2d 1295, 1298 (4th Cir.1987).
 
 
 24
 Our careful review of the trial transcript leads us to conclude that the trial court did not abuse its discretion in admitting the unexpurgated tapes and transcripts. While some of the language was offensive, the testimony as a whole was not so "suffused with an aura of non-specific criminality," United States v. Barletta, 652 F.2d 218, 220 (1st Cir.1981), to justify our overturning the district court's discretionary judgment. This conclusion is bolstered by the trial judge's careful cautionary instruction admonishing the jury to focus exclusively on the content of the conversations and not to be prejudiced by the distasteful language.
 
 III.
 
 25
 Worthington assigns numerous additional errors on appeal. We have reviewed these contentions and conclude that they are similarly without merit. Accordingly, the judgment of the district court is
 
 
 26
 AFFIRMED.
 
 SPROUSE, Circuit Judge, dissenting:
 
 27
 I respectfully dissent. In my view, the cumulative effect of trial court error and prosecutorial overkill deprived Worthington of a fair trial. The trial court erred in admitting the unredacted recordings of conversations between Worthington and Bowen and in failing to give the jury a cautionary instruction on informer credibility.
 
 
 28
 In its brief, the government concedes that the conversations between Worthington and Bowen (as well as those between Worthington and Stocks) were not "smoking gun" evidence and were open to interpretation:
 
 
 29
 While nothing in those taped conversations was so strongly incriminating as to be characterized as an admission of guilt by appellant or as an attribution of guilt to him by Bowen, the jury could infer that, had appellant been innocent of involvement in the arson, either Bowen or appellant himself would have made some declaration to Stocks in appellant's defense when confronted with Stocks' efforts to elicit incriminatory statements. Moreover, the incriminating character of some statements made on the tape recordings depended on how the jury assessed the speaker's actual meaning.
 
 
 30
 The government then describes one exchange in which it asserts that the "true meaning" is apparent from the sarcasm of the speakers' remarks. In a case such as this, where the probative value of a tape depends on the jury's assessment of nuances in dialogue, the risk of unfair prejudice from admission of a conversation marked by "obscenities, ethnic slurs, and otherwise coarse language, warped and suffused with an aura of non-specific criminality" is particularly great. United States v. Barletta, 652 F.2d 218, 220 (1st Cir.1981). I believe that the district court erred in admitting the unredacted tape here.
 
 
 31
 The trial court also declined Worthington's request for a cautionary instruction on the credibility of the government's star witness, torcher-turned-informer Stocks (an issue not discussed in the majority opinion). Courts have established different base lines in determining when such a cautionary instruction is necessary. Some have held that "a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it and the testimony implicating the accused is elicited solely from the informer or accomplice." United States v. Garcia, 528 F.2d 580, 587-88 (5th Cir.), cert. denied, 429 U.S. 898 (1976); see also United States v. Beard, 761 F.2d 1477, 1481 (11th Cir.), cert. denied, 474 U.S. 907 (1985). Others have required the instruction when the testimony is not materially corroborated, United States v. Lee, 506 F.2d 111, 120 (D.C.Cir.1974), cert. denied, 421 U.S. 1002 (1975), or is the primary evidence of the defendant's guilt, Territory of Guam v. Dela Rosa, 644 F.2d 1257, 1260 (9th Cir.1981) (as amended). Here, the government urges that, although Stocks' testimony was the principal evidence against Worthington on the arson and conspiracy counts, the testimony was corroborated by Stocks' two accomplices and by the aforementioned tapes. While it poses a close question, I would find that this case "warrant[ed] a judicial exposition on the frailties" of informer/accomplice testimony. Lee, 506 F.2d at 120.*
 
 
 32
 I am also disturbed by Worthington's claims that the government violated the North Carolina Rules of Professional Conduct by: (a) communicating with him while the prosecutor knew he was represented by counsel; and (b) engaging in impermissible contacts with the news media. Without reaching the issue of whether professional violations may constitute reversible error, I am persuaded that such prosecutorial overkill, coupled with the trial errors I have indicated, made it unlikely that Worthington received a fair trial.
 
 
 33
 For these reasons, I respectfully dissent.
 
 
 
 *
 Cf. Gormley v. United States, 167 F.2d 454, 457 (4th Cir.1948), and cases cited therein, holding a defendant may be convicted on the basis of accomplice testimony, but the better practice is to provide a cautionary instruction to the jury regarding such testimony