101 F.3d 107
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES of America, Appellee,
v.
Moorthy S. RAM, aka Srinivasan Ramamoorthy, Defendant-Appellant.
 No. 94-1583.
 United States Court of Appeals, Second Circuit.
 March 8, 1996.
 
 APPEARING FOR APPELLANT:Mark L. Furman, Jacobson and Goldberg, Garden City, NY.
 APPEARING FOR APPELLEE:Miriam R. Best, Assistant United States Attorney for the Eastern District of New York, Brooklyn, NY.
 E.D.N.Y.
 AFFIRMED.
 Present: MINER, JACOBS, CABRANES, Circuit Judges.
 
 
 1
 Defendant-appellant Dr. Moorthy S. Ram appeals from a judgment of the United States District Court for the Eastern District of New York (Seybert, J.), following a jury trial, convicting him of mail fraud, in violation of 18 U.S.C. § 1341, arson, in violation of 18 U.S.C. § 844(i), and attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(1). Ram was sentenced to an 84-month term of imprisonment, a three-year term of supervised release, a $25,000 fine, and a $400 special assessment.
 
 
 2
 In June of 1988, Ram opened his own medical practice, Wavecrest Medical Services, P.C. ("Wavecrest"), in Far Rockaway, New York. Immediately after opening the practice, Ram encountered financial difficulties. In August of 1989, Ram increased his insurance policy limit for loss and damage at Wavecrest from $200,000 to $300,000. Beginning on August 14, 1989, Ram arranged to have an x-ray machine moved from Wavecrest to his wife's office. He instructed his medical assistant, Elizabeth Martin, to cancel all of his appointments for Saturday, August 19th.
 
 
 3
 On Monday, August 21, 1989, Martin arrived at Wavecrest and discovered that the office had been broken into and severely vandalized. After the police had examined the damage, Ram gave Wavecrest's stereo to Martin and a typewriter to Nanda Persuad, another medical assistant, instructing them not to tell anyone about the equipment. On Wednesday, August 23, 1989, William Rosenthal, an adjuster with Allstate Insurance Company ("Allstate"), inspected the damage and told Ram that he estimated the damage as falling within the $15,000 to $20,000 range. Ram then told Rosenthal that Wavecrest's stereo, typewriter, and DMI simplicity holter machine (which later was recovered in the possession of another of Ram's employees) had been stolen. Rosenthal estimated that these stolen items added approximately $77,000 to the claim. Rosenthal made an appointment to return to Wavecrest on the morning of Friday, August 25th, so that he could further investigate.
 
 
 4
 On Friday, August 25th, at approximately 4:15 a.m., four separate fires were set in the Wavecrest offices. Fire Marshal Daniel Higgins and Rosenthal questioned Ram on the morning of the fire. Ram falsely told Higgins, inter alia, that he had no personal or financial problems. Ram falsely told Rosenthal that he had spent the weekend of August 19th and 20th driving to and from Ohio to pick up his family.
 
 
 5
 Several days after the fire, Ram gave Wavecrest's vacuum cleaner to Martin. Thereafter, Ram provided written documents to the police and to Allstate, in which he stated that Wavecrest's stereo, typewriter, and other equipment had been stolen during the vandalism incident and that Wavecrest's vacuum cleaner had been destroyed in the fire. Ram modified his claim by increasing it to $171,685, including an estimated $30,000 loss of income claim at $1000 per day for thirty days.
 
 
 6
 In February of 1991, Assistant United States Attorney Mark Cohen was assigned to the investigation of Ram. Sometime in March of 1991, Jerry Raffa, a Bureau of Alcohol, Tobacco, and Firearm Agent, asked Cohen "if [Cohen] would give [him] a grand jury subpoena that wasn't real, that [he] could hopefully in the future give to our cooperating witness so that the cooperating witness could meet Dr. Ram and wave the subpoena in Dr. Ram's face." Cohen later told Raffa that he could not issue "sham subpoenas."
 
 
 7
 On April 2, 1991, Cohen issued a subpoena requiring Persuad to testify before a grand jury on April 9, 1991. On the morning of April 9th, Persuad agreed to cooperate with the government. Raffa gave Persuad the grand jury subpoena to show to Ram as proof that she had testified before a grand jury that morning, even though she had not testified. Raffa instructed Persuad to tell Ram that she had to continue testifying before the grand jury the following day. Later that day, Persuad recorded a conversation with Ram, during which Ram acknowledged giving Persuad the typewriter and told her to "just maintain what you have said before."
 
 
 8
 On April 17, 1991, Raffa served Martin a subpoena with an April 23, 1991 return date. After being served the subpoena, Martin admitted that she had received the vacuum cleaner from Ram and agreed to record a conversation between herself and Ram. Raffa gave Martin the grand jury subpoena and instructed her to lie to Ram by telling him that she had to testify before the grand jury on April 19th. On April 18th, Martin recorded a conversation with Ram, during which Ram told her to continue to lie to the grand jury. Ram also instructed Martin to destroy the vacuum cleaner.
 
 
 9
 On June 25, 1991, Persuad testified before the grand jury. Martin, on the other hand, did not testify before the grand jury until September 15, 1993. In September of 1993, an indictment was returned charging Ram with mail fraud, in violation of 18 U.S.C. § 1341, arson, in violation of 18 U.S.C. § 844(i), and attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(1).
 
 
 10
 Prior to trial, Ram moved to suppress the recorded conversation Martin and Persuad had with Ram. Ram argued that, because Cohen had issued "sham subpoenas" for the purpose of eliciting statements from him, the tape recordings should be suppressed pursuant to this Court's decision in United States v. Hammad, 858 F.2d 834 (2d Cir.), cert. denied, 498 U.S. 871 (1988). The district court denied the motion, but stated that it would refer the matter to a disciplinary committee to further investigate Cohen's conduct.
 
 
 11
 On January 21, 1994, Barbara D. Underwood, Chief Assistant United States Attorney, wrote a letter to the district court requesting that it reconsider its decision to refer the matter to a disciplinary committee. The letter included an affirmation from Cohen, in which Cohen explained the events relating to the issuance of the subpoenas.
 
 
 12
 On January 31, 1994, Ram's trial commenced. In February of 1994, the jury found Ram guilty on all counts, and Ram was sentenced by the district court. Thereafter, Ram appealed. While his appeal was pending, Ram's appellate counsel discovered Underwood's letter of January 21st and Cohen's affirmation. Ram subsequently moved for a new trial pursuant to Fed.R.Crim.P. 33. The district court denied the Rule 33 motion, finding that Cohen had not violated Disciplinary Rule 7-104(a)(1) and had not intended to circumvent the "decision or admonition in the Hammad decision." Ram appealed the denial of the Rule 33 motion, and that appeal was consolidated with his initial appeal.
 
 
 13
 Although Ram claims that there is insufficient evidence to uphold his conviction for arson, we believe that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The record contains ample evidence that Ram broke into and vandalized the Wavecrest offices. First, Ram's financial difficulties created a strong motive for him to vandalize the office and to collect on the insurance policy. In addition, Ram increased the limit on his insurance policy in August of 1989 from $200,000 to $300,000. The new limit became effective on August 19th, the same day the office was vandalized. Moreover, during the week preceding the vandalism incident, Ram moved expensive medical equipment out of the office, and instructed his assistants to cancel all appointments scheduled for August 19th. Finally, the government introduced Hospital records in Ram's own handwriting that showed that he was at two hospitals in New York City on August 19th and 20th, thus refuting his claim that he had been driving to and from Ohio on those days. The evidence that Ram set fire to Wavecrest logically supports the finding that he was the individual who vandalized the office. By setting the fire, Ram could conceal his involvement with the vandalism and stolen property and could collect more insurance money. The evidence was sufficient for a reasonable trier of fact to conclude that Ram committed the arson.
 
 
 14
 Ram also claims that the district court erred in denying his Rule 33 motion and in finding that, under this Court's decision in Hammad, Cohen did not violate DR 7-104(a)(1) by issuing sham subpoenas. We reject this claim. In Hammad, the prosecutor never intended to have the subpoenaed witness testify and knew that the subpoena would be used to elicit statements from the target of a government investigation. However, in the present case, the district court found that Cohen intended to have Persuad and Martin testify before the grand jury, and that Cohen did not know that the subpoenas would be used to elicit conversations with Ram. No sham subpoenas were issued in this case. Therefore, unlike the prosecutor in Hammad, Cohen did not violate DR 7-104(a)(1).
 
 
 15
 Ram also contends that the district court erroneously enhanced his sentence for arson under U.S.S.G. § 2K1.4(a)(1) for knowingly creating a substantial risk of death or serious bodily injury. He argues that the district court erred in requiring only a showing that he "knew or should have known" of the risk, rather than requiring a showing that he "actually knew" of the risk. This argument is without merit.
 
 
 16
 Although this Court has not determined what level of knowledge is required under § 2K1.4(a)(1), we do not need to reach this question here because the district court found that Ram had actual knowledge of the risk. The court stated that Ram had "obvious knowledge that [his] conduct would create and did create a substantial risk of death or bodily harm." (Emphasis added). In addition, because the record indicates that Ram knew that Wavecrest was located on the ground floor of a six-story apartment building, and that most of the residents would be sleeping in their apartments at the time the fire was set, we believe that there is sufficient evidence demonstrating that Ram had actual knowledge of the risk.
 
 
 17
 Finally, Ram claims that the district court erred in finding, pursuant to U.S.S.G. § 2K1.4(b)(1), that he committed the arson to conceal his involvement in the vandalism incident and the insurance fraud scheme. We believe that there is sufficient evidence to support the district court's finding in this regard.
 
 
 18
 We have considered Ram's remaining contentions, and we find them all to be without merit.