573 A.2d 51

**In re CRIMINAL INVESTIGATION NO. 13 IN the CIRCUIT COURT FOR DORCHESTER COUNTY.**

**No. 1150, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 4, 1990.

John E. Griffith, Jr. (Linda L. Richardson and Piper & Marbury, Baltimore and Hubert H. Wright, IV, Cambridge, on the brief), for appellant.

Norman L. Smith and Nathan Braverman, Asst. Attys. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and GARRITY, JJ.

MOYLAN, Judge.

The unnamed appellant is a family-owned chemical company in Dorchester County. At some time before January 27, 1989, the Environmental Crimes Unit of the Attorney General's Office began an investigation of the appellant corporation (the Corporation) and some of its employees for

alleged violations of both the State's Hazardous Substance Control Law and the State's Water Pollution Control Law. Among the violations being investigated[1] were the felonious storage, treatment, discharge, disposal, and abandonment of hazardous waste at an unpermitted facility. The Corporation was already on probation for prior felony convictions involving the unlawful storage and disposal of hazardous waste. At the time a search warrant was executed, moreover, it did not possess any of the necessary permits to store, treat or dispose of such materials on the five-acre site being searched. Apparently, a number of lower-level employees, not simply managerial-level employees, were involved in the alleged transgressions.

The Corporation was represented by counsel. Corporation counsel objected, both orally and in writing, to any interviewing of any employee of the Corporation without the consent of corporation counsel and without the presence of corporation counsel. The employees interviewed were not themselves represented by counsel. It based its objection upon its reading of Maryland Rule of Professional Conduct 4.2:

> "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

When, in June, 1989, the Attorney General's Office informed corporation counsel that, at least with respect to non-managerial employees, it had no intention of honoring corporation counsel's request, the Corporation sought an *ex parte* injunction from Judge Donald F. Johnson in the Circuit Court for Dorchester County. Judge Johnson denied the injunction and this appeal has timely followed.

---

1. In an affidavit in support of a search warrant, the State listed the alleged violations it was investigating.

■ We hold that Judge Johnson was correct in denying the injunction. He took as his standard *Good v. State*, 240 Md. 1, 7, 212 A.2d 487 (1965), where the Court of Appeals stated, "A Court of Equity has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property." He went on to point out that "where it is likely that Petitioner's property rights will be irreparably harmed as a result of a criminal investigation, equity will act to protect those rights which cannot be vindicated by the criminal process." He concluded, however, that because the corporation "has not met its burden of showing its property rights would be irreparably injured unless the requested relief is granted, the Court is going to deny the motion for interlocutory injunction."

■ The primary thrust of the appellant's argument is the alleged violation by the Attorney General's Office of Rule of Professional Conduct 4.2. Without remotely intimating that we think there was any violation of the Rule on the merits, the short answer to the contention is that even if the Rule had, *arguendo*, been violated, that would not provide the appellant with the solace it seeks. In the Scope Note on the Rules of Professional Conduct, the Court of Appeals pointed out:

"Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to

augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty."

Appendix: Rules of Professional Conduct, 2 Md.Rules 483 (1990 Repl.Vol.). *See also In re: Special Investigation No. 231,* 295 Md. 366, 374, 455 A.2d 442 (1983); *Hooper v. Gill,* 79 Md.App. 437, 442–443, 557 A.2d 1349 (1989); *Magness v. Magness,* 79 Md.App. 668, 683–684, 558 A.2d 807 (1989).

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court, in declining to permit an injunction of allegedly unconstitutional investigative conduct, discussed the "underlying reason for restraining courts of equity from interfering with criminal prosecutions." 401 U.S. at 44, 91 S.Ct. at 750. One of the venerable limitations upon equitable interference with the investigative process is that:

"[c]ourts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."

401 U.S. at 43–44, 91 S.Ct. at 750. The Court went on to discuss the nature of "irreparable injury" and to point out that such things as the cost and the anxiety of defending against a prosecution do not represent the type of irreparable injury contemplated:

"In all of these cases the Court stressed the importance of showing irreparable injury, the traditional prerequisite to obtaining an injunction.... [E]ven irreparable injury is insufficient unless it is 'both great and immediate.' ... Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." (Citation omitted).

401 U.S. at 46, 91 S.Ct. at 751.

The general principle that an equitable injunction is not available for the type of purpose sought by the appellant

here was well stated by Justice Frankfurter in *Stefanelli v. Minard*, 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951):

> "The maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo–American law. It is impressively reinforced when not merely the relations between coordinate courts but between coordinate political authorities are in issue."

In *Stefanelli*, the petitioner sought to enjoin the New Jersey Police from offering the fruits of an unconstitutional search into evidence at his criminal trial. The Supreme Court catalogued a number of reasons why the injunction was inappropriate. One of them is that the propriety of the investigative procedure may be adequately tested in a subsequent criminal trial:

> "No such irreparable injury, clear and imminent, is threatened here. At worst, the evidence sought to be suppressed may provide the basis for conviction of the petitioners in the New Jersey courts. Such a conviction, we have held, would not deprive them of due process of law."

342 U.S. at 122, 72 S.Ct. at 121. *Douglas v. Jeannette*, 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), spoke directly to the adequacy of the criminal trial as the only necessary relief that need be provided for allegedly improper investigative behavior:

> "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction."

*See also WAAM v. Ober*, 199 Md. 203, 205, 86 A.2d 399 (1952); *Good v. State*, 240 Md. 1, 7–8, 212 A.2d 487 (1965).

At an even more basic level, the relief sought by the appellant would produce a flagrant breach of the separation of powers. The judicial branch of government, of course, may judge the propriety of the actions of the executive branch when a criminal case finally comes before it. As a general rule, however, it may not inject itself, as a monitor or censor, into the functioning of that executive branch during the course of an investigation. In *Triple A Machine Shop, Inc. v. State,* 213 Cal.App.3d 131, 261 Cal.Rptr. 493 (1989), lawyers for the State were investigating environmental crimes against a defendant corporation even while civil litigation was pending. The trial court enjoined any further interviewing of certain employees of the target corporation, holding that the prosecutors would thereby be violating a former California disciplinary rule which essentially tracked our Rule 4.2. The appellate court reversed the trial court, holding, at 501:

> "The most significant effect of the injunction lies in its impact on the investigation and prosecution of the criminal charges. The separation of powers doctrine requires judicial restraint in enjoining criminal investigations or prosecutions. The prosecutor's authority stems from the executive branch of government ... and the investigation and gathering of evidence relating to criminal offenses is the prosecutor's responsibility and rests solely within his or her discretion.... The discretionary authority vested in the District Attorney to investigate and prosecute criminal conduct is considered too vital to the interest of public order to be subjected to prior restraint by the courts except under extraordinary circumstances." (Citations omitted).

Similar reasoning was used by the United States Court of Appeals for the District of Columbia in *Reporters Comm. for Freedom of the Press v. American Telephone & Telegraph Co.,* 593 F.2d 1030, 1065 (D.C.Cir.1978):

> "A party invoking equitable intervention in the criminal investigative process has a particularly heavy burden. Only the most extraordinary circumstances warrant anti-

cipatory judicial involvement in criminal investigations. Even where federalism concerns are absent, the fundamental concept of separation of powers dictates judicial restraint. The powers of criminal investigation are committed to the Executive branch. The balance between the Executive and Judicial branches would be profoundly upset if the Judiciary assumed superintendence over the law enforcement activities of the Executive branch upon nothing more than a vague fear or suspicion that its officers will be unfaithful to their oaths or unequal to their responsibility."

*See also Socialist Workers Party v. Attorney General,* 510 F.2d 253 (2d Cir.1974) (the granting of an injunction against the FBI surveillance of a convention of the Socialist Workers Party was held to be an abuse of discretion).

Perhaps the strongest statement as to the primacy of the executive branch in the investigation of crime was that of *Jett v. Castaneda,* 578 F.2d 842, 845 (9th Cir.1978):

"[T]he investigation of crime is primarily an executive function. Nowhere in the Constitution or in the federal statutes has the judicial branch been given power to monitor executive investigations before a case or controversy arises. Without an indictment or other charge bringing a defendant before the court, or in the absence of a pending grand jury investigation, a district court has no general supervisory jurisdiction over the course of executive investigations."

■ The weightiest of all arguments against the appellant's position, however, is the one based upon simple common sense. If the law were as the appellant urges it upon us, there could be little effective investigation of any sophisticated and organized criminal enterprise. A successful case, for instance, against insider trading on Wall Street may depend upon hundreds of confidential interviews of employees, many of whom will insist upon anonymity. It would be difficult to maintain anonymity if the boss's lawyer were present at the interview.

It is inconceivable that undercover investigators could ever subtly ingratiate themselves into the confidence of Mafia "soldiers" if the *consigliere* for the Family could insist upon being present at those "interviews." Indeed, under such constraint, one could never "spin" or "turn" an underling into an informant without the *consigliere*'s being guilty of shameful malpractice.

No FBI "mole," spending months or years in the painstaking infiltration of the Communist Party or the Ku Klux Klan, could even talk to his unsuspecting targets. The investigations of Watergate, Teapot Dome and Credit Mobilier would have been dead in the water before they were underway. Notwithstanding their protestations of offended outrage, this is the company in which investigative targets find themselves as society contemplates the investigative process. The ultimate authority against the appellant's thesis is the realization that it is self-evidently absurd.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.