**UNITED STATES of America, Plaintiff,**

v.

**Jay MARCUS, Hedviga Herman, Fredrick Shainfeld, Amirul Islam and Muhammad Uddin, Defendants.**

**Crim. No. PJM 93–0286.**

United States District Court,
D. Maryland,
Baltimore Division.

April 21, 1994.

Christopher B. Mead, Asst. U.S. Atty., Baltimore, MD, for plaintiff.

Don O. Burley, Washington, DC, David B. Irwin, Baltimore, MD, J. Sedwick Sollers, III, Washington, DC, for defendants.

## *OPINION*

MESSITTE, District Judge.

### I.

In this case, joining the nearly unanimous opinion of courts that have spoken to the issue, the Court holds that a prosecutor's use of a wired informant for the purpose of recording conversations with the represented target of a criminal investigation, even to the point of suggesting topics to be discussed, does not violate professional disciplinary rules. Accordingly, the Court denies the motions of the several Defendants to suppress certain wire recordings.

### II.

In the late 1980s, Congress launched an investigation into reported widespread abuses in the generic drug industry in this country. By the summer of 1989, the U.S. Food and Drug Administration (FDA) had commenced extraordinary inspections of some 20 generic drug firms, including Halsey Drug Company, Inc. of Brooklyn, New York (Halsey). Finding irregularities in the documentation of some of Halsey's research and development batches and suspecting fraud in Halsey's Abbreviated New Drug Applications, FDA transmitted Halsey's name to the Justice Department's Office of Consumer Litigation for criminal investigation. The Justice Department, through the U.S. Attorney's Office in the District of Maryland, subsequently commenced a grand jury investigation of Halsey and on July 25, 1991, issued a subpoena to Halsey, requesting certain documents.

Halsey responded to the subpoena, represented by the Baltimore law firm of Piper & Marbury. The records they submitted, while confirming certain irregularities in documentation, did not explain those irregularities to the Government's satisfaction.

In February, 1993, FDA came upon what it believed was an explanation. A former Halsey employee, meeting with FDA's New York District representatives, indicated that for certain products Halsey maintained alternate formulae on handwritten "phony cards." These cards allegedly set out unapproved or altered formulae for drugs as opposed to the FDA-approved formulae. The former employee told FDA that Halsey's management had directed its employees to follow these alternative formulae, but to fill out false production batch records for the products so it would appear that the FDA-approved formulae had in fact been followed. Allegedly Halsey's granulation supervisor kept these "phony cards" hidden from FDA's inspectors. The former employee provided photocopies of what he identified as "phony cards" for generic drug products Quinidine Gluconate 324 mg tablets and Metronidazole 250 mg tablets, and orally described deviations from approved master formulae in connection with other products including Acetaminophen and Codeine Phosphate tablets.

On March 2, 1993, the former employee, joined by a second former employee who corroborated the testimony, appeared before the grand jury in Baltimore and repeated the statements earlier made to FDA's investigators, further testifying that Halsey was still following the "phony card" formulae as of the time they had left the company's employ.

In the meantime, Christopher B. Mead, an Assistant U.S. Attorney in the Office of the U.S. Attorney for the District of Maryland, in consultation with an FDA bioequivalent expert, concluded that Halsey's alternate formula for Quinidine Gluconate, used to treat irregular heartbeats, posed a potential health threat. The Government thus had grounds to believe as of that time (1) that Halsey might yet be adding unapproved ingredients to the heart medication; (2) that it was falsifying batch records even while under grand jury investigation; and (3) that it was obstructing the grand jury's investigation by not turning over documentation clearly responsive to the subpoena that had been served in 1991.[1]

1. The grand jury subpoena had requested, among other things:

H. All documents that record, refer, relate, or pertain in any way to standard operating pro-

The investigation went forward quickly. Government investigators had also learned during the grand jury testimony of the former Halsey employees that Halsey's granulation supervisor, Marlon Forde, was an illegal alien. Working through the Federal Bureau of Investigation and the Immigration and Naturalization Service, AUSA Mead arranged for agents to confront Forde and promise him leniency if he would agree to wear a body recorder and engage Halsey's management in conversation about the "phony cards." On March 3, 1993, after Government agents confronted Forde and put him in telephone contact with Mead, Forde agreed to wear the body wire.

Mead instructed Forde to report to work at Halsey the next day and advise management personnel that he had been confronted by FDA agents who asked about the "phony cards," particularly Quinidine Gluconate. He was further instructed to say that he had refused to speak with the agents but to ask Halsey's managers for advice as to what to do. On March 4, wearing a body recorder, Forde proceeded as planned, engaging all the Defendants in potentially incriminating conversations about the "phony cards."

In addition, Defendant Marcus, Halsey's President, told Forde he would arrange for him to speak to the company lawyer the next day. Listening to the tape that evening, the special prosecution staff agents instructed Forde to wear the wire to work the next day and inquire of Marcus what it was he (Forde) should say to the company lawyer about Quinidine Gluconate. One of the agents specifically instructed Forde to turn off the body recorder if he had any direct dealings with the company lawyer, as opposed to Marcus, in order to avoid infringing upon any privileged conversations. AUSA Mead knew of this plan and approved it. On March 5, Forde again engaged Defendant Marcus in conversation, capturing further potentially incriminating conversations on tape, particularly with reference to Quinidine Gluconate.

On March 8, Mead met with Halsey's attorneys and served them with another grand jury subpoena, this time requesting among other things all "phony cards" in Halsey's possession. Because he wished to preserve Forde's operational capability, Mead did not advise counsel of Forde's cooperation. Halsey's attorneys, after conducting an investigation on their own, promptly produced some of the "phony cards" and agreed to recall any products related to those cards.

In July, 1993, on the basis of the Government's accumulated evidence, the grand jury indicted Defendant Marcus, Halsey's President and Chief Executive Officer; Defendant Herman, the company's Assistant Vice–President of Manufacturing; and Defendant Shainfeld, the company's Senior Vice–President of Technical and Regulatory Affairs and New Product Development.

### III.

Defendants have moved to suppress the tapes of their respective recorded conversations [2], alleging that, given the Government's

---

cedures and/or routine operating procedures, effective on or before the date of this subpoena, relating to:

. . . . .

2) the accuracy of records regarding the manufacturing of commercial batches of drug products;

. . . . .

8) the documentation of changes in the formulation, method of manufacture, testing, or the manufacturing facilities of drug products for commercial distribution.

. . . . .

I. All documents that record, refer, relate, or pertain in any way to pilot, test, experimental, and/or commercial batches of the ANDAs [Abbreviated New Drug Applications] referenced in paragraph G of this subpoena [which included Quinidine Gluconate 324 mg. tablets],

granulation, tablets or capsules conforming or not conforming to any of the standard and/or routine operating procedures listed in response to subparagraphs 1 through 9 of paragraph H.

**2.** Defendant Marcus asks for the suppression of his recorded conversations of March 4 and 5, 1993, Defendant Herman of the conversation with her recorded on March 4, 1993. Defendant Shainfeld has "adopted" Defendant Marcus' Motion and is apparently seeking to suppress Marcus' statements as well as any statement of his own. The Government has not raised the issue of Shainfeld's standing to challenge the Marcus tapes.

knowledge that Halsey was represented by legal counsel, the taping of management level employees violated DR 7–104(A)(1) of the American Bar Association's Model Code of Professional Responsibility. The Government vigorously denying that its preindictment undercover contacts with Defendants, even if they were represented, violated any ethical rules of this Court, urges that Defendants' Motions be denied.

### IV.

■ The disciplinary rule upon which Defendants place their reliance upon is straightforward enough. DR 7–104(A)(1) (1983) provides that:

(A) During the course of his representation of a client, a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

But Defendants argue that the interpretative case law applicable to this ethical precept is the law of the Eastern District of New York, where the challenged taping occurred and where the company under investigation was headquartered. That law, say Defendants, is set forth in *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988), in which the U.S. Court of Appeals for the Second Circuit held that DR 7–104(A)(1) applies so as to restrict the Government's contacts with represented persons at the preindictment stage.

Whatever *Hammad*'s scope may actually be, Defendants cite no authority in support of the proposition that a federal court sitting in one jurisdiction is required to apply the ethical rules of a federal court in another jurisdiction. The Government contends and the Court must agree that the only authority this Court might have for suppressing evidence based on the violation of an ethical rule would be its own rules of professional conduct, in this case the Rules of Professional Conduct of the Maryland Court of Appeals. See Local Rule 704. And Maryland, which once followed DR 7–104(A)(1) of the Model Code, more recently has adopted Rule 4.2 of the Rules of Professional Conduct which provides as follows:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer *or is authorized by law to do so.* (Emphasis added).

Since this rule is sufficiently close to DR 7–104(A)(1), case law interpreting both rules is relevant in determining the present motions, but that case law, as will be seen, differs quite markedly from the law of the Second Circuit as set out in *Hammad.*

■ Maryland's Court of Special Appeals, to begin with, has already had occasion to interpret Rule of Professional Conduct 4.2, holding in *In re Criminal Investigation No. 13,* 82 Md.App. 609, 573 A.2d 51 (1990), that preindictment undercover operations against represented targets do not violate the State's professional ethical proscriptions. In that case, counsel for a corporation targeted in connection with alleged violations of environmental laws sought to enjoin the Maryland Attorney General, based on Rule of Professional Conduct 4.2, from interviewing corporate employees. In affirming the circuit court's denial of an injunction on the grounds that equity has no jurisdiction to enjoin a criminal proceeding, the court made pertinent observations regarding the claimed applicability of that ethical rule to criminal investigations:

The weightiest of all arguments against the appellant's position, however, is the one based upon simple common sense. If the law were as the appellant urges it upon us, there could be little effective investigation of any sophisticated and organized criminal enterprise....

No FBI "mole," spending months or years in the painstaking infiltration of the Communist Party or the Ku Klux Klan, could even talk to his unsuspecting targets. The investigations of Watergate, Teapot Dome and Credit Mobilier would have been dead in the water before they were underway. Notwithstanding their protestations of of-

fended outrage, this is the company in which investigative targets find themselves as society contemplates the investigative process. The ultimate authority against the appellant's thesis is the realization that it is self-evidently absurd.

573 A.2d at 55.

Even more compelling is the fact that, with the exception of *Hammad,* federal appellate case law is virtually unanimous in holding that preindictment under cover operations against represented targets are not contrary to the Rules of Professional Conduct. *See United States v. Sutton,* 801 F.2d 1346 (D.C.Cir.1986); *U.S. v. Lemonakis,* 485 F.2d 941 (D.C.Cir.1973), cert. den., 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); *U.S. v. Heinz,* 983 F.2d 609 (5th Cir.1993); *U.S. v. Fitterer,* 710 F.2d 1328 (8th Cir.1983), cert. den., 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *U.S. v. Powe,* 9 F.3d 68 (9th Cir.1993); *U.S. v. Ryans,* 903 F.2d 731 (10th Cir.1990), cert. den., 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990).[3] Moreover, as the Fifth Circuit recently summarized:

[O]ur research shows that no court has ever suppressed evidence in a criminal case because a prosecutor ... violated DR 7–104(A)(1) in the course of an investigation and before the grand jury indicted the defendant.

*Heinz,* 983 F.2d at 613.[4]

The fundamental rationale of the federal appellate courts closely parallels that of the Maryland Court of Special Appeals in *In re Criminal Investigation No. 13, supra.* As the Fifth Circuit wrote in *U.S. v. Heinz:*

The dullest imagination can comprehend the devastating effect that such a rule would have on undercover operations.

Any potential defendant with an attorney would be insulated from any undercover operation; any potential defendant without an attorney would hire an attorney (if he could afford to do so) in order to build a wall between himself and the government's investigators. It's [sic] effect would not be limited to undercover operations of course, but would impede, obstruct, and even eliminate many continuing investigations of organized crime, racketeering, and drug dealing.

983 F.2d at 614.

Clearly, therefore, these several cases place preindictment contacts with represented individuals within the "authorized by law" exception of DR 7–104(A)(1) or Rule of Professional Conduct 4.2.

Finally there is the *Hammad* case itself, upon which Defendants place such heavy reliance. Apart from the fact that the Second Circuit's opinion stands alone in holding that the disciplinary rules apply to preindictment contacts with targeted defendants, it is questionable whether the case stands for all Defendants say it does. In *Hammad,* an Assistant U.S. Attorney had provided a counterfeit grand jury subpoena to a cooperating witness in order to elicit statements from a targeted individual which were taped. While holding such "egregious misconduct" violative of DR 7–104(A)(1), the Second Circuit entered several caveats:

We are mindful, however, that suppression of evidence is an extreme remedy that may impede legitimate investigatory activities. Accordingly, we find, in this case, that suppression of the recordings and videotapes constituted an abuse of the district court's discretion * * * we urge a restraint in applying the rule to criminal

---

**3.** Apparently three circuits have applied the rule in preindictment custodial, as opposed to noncustodial, settings. *See U.S. v. Killian,* 639 F.2d 206 (5th Cir.1981), cert. den., 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *U.S. v. Durham,* 475 F.2d 208 (7th Cir.1973); *U.S. v. Thomas,* 474 F.2d 110 (10th Cir.1973), cert. den., 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973).

**4.** The near concurrence of the circuits in interpreting ethics rules to allow preindictment undercover operations counters to a considerable extent Defendants' argument that the Justice Department can forum shop and circumvent the

ethical rules of a particular court by deciding that an investigation should be conducted by a particular U.S. Attorney's Office. On the other hand, the Court notes that the Justice Department is currently proposing a uniform rule to govern the circumstances under which its attorneys may communicate with persons and organizations known to be represented by counsel in the course of law enforcement investigations. *See* Proposed Rulemaking, "Communications With Represented Persons," 59 Fed.Reg. 10,086 (1994) (proposed codification at 28 C.F.R. § 77).

investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence * * * (W)e ... would not interpret the disciplinary rule as precluding undercover investigations * * * As we see it, under DR 7–104(A)(1), a prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization.

Notwithstanding this holding, however, we recognize that in some instances a government prosecutor may overstep the already broad powers of its office, and in so doing, violate the ethical precepts of DR 7–104(A)(1).

858 F.2d at 837–839.

The court, then, actually *reversed* the trial judge's decision to suppress the tapes; moreover, at no point did it delineate what prosecutorial actions might run afoul of the rules to the point of justifying suppression. Equally significant, since *Hammad,* no district court in the Second Circuit applying *Hammad* appears to have found a violation of the disciplinary rule. *See e.g. U.S. v. Scozzafava,* 833 F.Supp. 203 (W.D.N.Y.1993); *U.S. v. Santopietro,* 809 F.Supp. 1008 (D.Conn.1992); *U.S. v. Harloff,* 807 F.Supp. 270 (W.D.N.Y.1992); *U.S. v. Buda,* 718 F.Supp. 1094 (W.D.N.Y.1989); *see also U.S. v. DeVillio,* 983 F.2d 1185 (2d Cir.1993). In at least one of these cases, the Court found *Hammad* inapplicable where the prosecutor specifically suggested the topics of conversations that the cooperating witness should have with the targeted individual. *See U.S. v. Scozzafava,* 833 F.Supp. at 209; *but see U.S. v. Buda,* 718 F.Supp. at 1096.

But finally, whatever else may be said about *Hammad,* it is evident that its holding has been roundly rejected by other circuits. Although the Fourth Circuit has not yet considered the matter, the Court believes that in all likelihood this Circuit would adhere to the majority view. The Court accordingly decides that no rule of professional conduct precludes preindictment undercover contacts between the Government and a represented target, at least in a non-custodial setting.[5]

Defendants' Motions to Suppress the recordings of statements made by them to Marlon Forde will therefore be DENIED.[6]

### ORDER

Upon consideration of the Motions of Defendants Marcus, Herman, and Shainfeld to Suppress recordings of Conversations between them and Marlon Forde made in March, 1993, and the Government's Opposition thereto, it is this 21 day of April, 1994

---

5. Even if such a rule were to apply, no unfairness or abuse characterized the Government's actions here. Although the prosecutor directed the cooperating witness to ask the targeted defendant what to say to the corporate attorney, the Government was careful to instruct the witness not to record actual attorney-client communications. No attorney was present during the recording of the conversations nor is there any contention that the defendant was acting as the attorney's agent. Nor can it be said that the Government in any way sought to learn defense strategy or tactics, to invade the defense camp or otherwise interfere with the ability of Halsey's attorney to advise and assist. *See U.S. v. Scozzafava,* 833 F.Supp. at 210–211. When asked to talk to Halsey's attorney by Defendant Marcus, Forde in substance asked the simple and natural next question, "What do I say?" However artful that question may turn out to have been, it was entirely fair and reasonable under the circumstances.

6. In addition to arguing violation of the disciplinary rules, Defendants contend that the informant's conversations with Defendant Marcus were protected by the attorney-client privilege. *See U.S. v. (Under Seal),* 748 F.2d 871 (4th Cir. 1984) (recognizing the attorney-client privilege). The Court also rejects that argument. The absence of any lawyer from the scene, the fact that Marcus was clearly not acting as agent for the lawyer, and the absence of any suggestion that the parties at the time believed themselves protected by the privilege, make that argument particularly unpersuasive. Compare *Burlington Industries v. Exxon Corp.,* 65 F.R.D. 26 (D.Md. 1974); *Eutectic Corp. v. Metco, Inc.,* 61 F.R.D. 35 (E.D.N.Y.1973). The mere fact that parties may talk to each other about what to say to an attorney cannot *ipso facto* make the conversation privileged. Were that so, participants could always argue, after the fact, that the dominant purpose of their conversation was to facilitate an attorney's provision of legal advice and that they believed the conversation was privileged.

ORDERED that said Motions be and the same are hereby DENIED.